**Theresa J. STE. MARIE, Individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**EASTERN RAILROAD ASSOCIATION and Traffic Executive Association, Defendants.**

No. 75 Civ. 4736.

United States District Court, S. D. New York.

July 23, 1980.

Sue Wimmershoff-Caplan, New York City, for plaintiffs.

Conboy, Hewitt, O'Brien & Boardman, New York City, for defendants; Myron D. Cohen and David Rees Davies, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

### I

This action was commenced in 1975 by the named plaintiff filing a claim on her

own behalf and on behalf of all other female employees of defendant [1] alleging that the latter's employment practices violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Two determinations have already been rendered by the court, familiarity with which will be assumed. Plaintiff's motion for certification of the action as a class action representing all of defendant's female employees was granted, 72 F.R.D. 443 (1976), and a Stage I holding that plaintiff had established a prima facie case by showing that "female employees as a class had been subjected to disparate treatment because of their sex" was rendered. 458 F.Supp. 1147, 1165 (1978). We have now reached Stage II, the final stage of this litigation in this court. At this phase of the proceedings, hearings were held on October 10–28, 1979, to enable the individual members of the class to establish their entitlement, if any, to (1) monetary damages, (2) an order affirmatively requiring defendant to adopt employment practices which will insure compliance with Title VII, and (3) an award of counsel fees and other special costs assessed against defendant.

## II

■ At this stage of the proceeding a rebuttable presumption is operative that each member of the class was discriminated against because of her sex, and that various employment decisions during the period when unlawful discrimination was found to exist were made in pursuit of the employer's unlawful policy. The burden rests upon the employer to overcome that presumption. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360–62, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. 747, 772–73, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444 (1976). Members

of the class are seeking backpay awards, and the law is settled that where unlawful employment discrimination has been found, "backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). *See also Franks v. Bowman Transportation Co. Inc., supra*, 424 U.S. at 763–64, 771, 96 S.Ct. at 1263–64, 1267. However, "[t]here is no evidence of any salary disparities between men and women occupying the same position." *Ste. Marie v. Eastern Railroad Association, supra*, 458 F.Supp. at 1156. The statistical data evidencing a gap between male and female employees in salary and salary expectations was found to result from the exclusion of women "from top ranking management positions." *Ibid.*

■ Moreover, as has been indicated in the Stage I proceedings, defendant has removed some of the indices of gender-based bias. Backpay awards, however, are not granted to punish the employer, but to make whole the victims of discrimination. Hence a defendant's good faith is irrelevant. *Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant*, 491 F.2d 1364, 1376 (5th Cir. 1974). While the Equal Employment Opportunity Commission has recently adopted a policy recognizing the good faith efforts of unions and employers acting jointly or unilaterally to eliminate discriminatory employment practices, the good faith effort must be of a compelling and aggressive nature to warrant recognition. *See EEOC Resolution to Encourage Voluntary Affirmative Action*, April 1, 1980, 42 U.S.L.W. 2660 (April 8, 1980).[2]

---

1. There are two defendants here—Eastern Railroad Association and Traffic Executive Association—but since for our purposes defendants acted as an integrated entity, they will be grouped throughout as one defendant.

2. The resolution reads as follows:

Whereas the EEOC has a responsibility to encourage voluntary endeavors to eliminate discriminatory employment practices, it is resolved that the EEOC adopts the following policy:

1. Through its administrative processes, the EEOC shall recognize the "good faith"

The defendant has not succeeded in eliminating all gender-based discrimination and seems only dimly aware of how far distant its practices are from the requirements of Title VII and relevant case law in respect of eliminating all vestiges of employment bias. Under the circumstances, to deny backpay to employees who were barred from advancement because of their sex would clearly defeat the central purposes of Title VII, *see Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 421, 95 S.Ct. at 2373, and constitute an abuse of discretion. Thus, while class-wide backpay is an appropriate remedy in light of the Stage I finding, *see Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant, supra,* 491 F.2d at 1375, such compensation may properly be awarded only to those members of the class who were subjected to gender-based discrimination by being denied a promotion or upgrading or the opportunity to which they otherwise would have been entitled. *See English v. Seaboard Coastline R. R. Co.,* 12 FEP Cases 90, 92–93 (S.D.Ga. 1975).

During the Stage II evidentiary hearing plaintiff did present evidence showing that a number of the class members were in fact for a time performing the duties and responsibilities of their superiors without benefit of the title or pay their superiors enjoyed. While it is established that members of the class were denied promotional opportunities because of their sex, the court is not convinced that these instances of women performing some of the responsibilities of their male superiors stemmed from gender-based discrimination. In any organization, there are times when subordinates have to assume their superiors' burdens.

There was no convincing evidence that the pattern in this regard differed substantially from the norm. Accordingly, an award of backpay on this basis is disallowed.

Plaintiff's class has clearly been denied equal access to promotional benefits and advantages, however, and during the Stage II proceedings various individual members of the class presented evidence designed to show that they had been qualified for promotion but were denied upgrading because of their sex. Defendant sought to counter these claims by proving that each employee in question would not have been promoted even absent defendant's discriminatory policy because she failed to meet valid non-discriminatory criteria for advancement. *See Richerson v. Jones,* 551 F.2d 918, 924–25 (3d Cir. 1977); *Day v. Mathews,* 530 F.2d 1083, 1085 (D.C.Cir.1976); *Cooper v. Allen,* 467 F.2d 836, 840 (5th Cir. 1972). We now turn to the specific claims of the individual claimants.

### III

A. Mary Matthews was employed as a file clerk in 1972; in November, 1972, she was made a junior rate clerk, and was promoted to intermediate rate clerk in 1973. She enrolled in the Traffic Academy. In June, 1974, while she was still attending the Academy and acting as senior rate clerk, she applied for promotion to senior rate clerk. Defendant, however, passed over Matthews and, instead, on June 28, 1974, promoted two men to this position. One of these men was junior to Matthews in terms of service by 6 months, the other by 7; neither had attended the Traffic Academy. Defendant claims that Matthews, who had

---

efforts of unions and employers to eliminate discriminatory employment practices, whether undertaken in cooperation with each other or unilaterally; "good faith" must be of a compelling and aggressive nature evaluated on a case-by-case basis.

2. When engaged in investigation, conciliation, and enforcement, the EEOC shall exercise its discretion in recognition of union or employer voluntary affirmative action that meets appropriate standards.

3. In order to implement this policy, the Offices of Field Services, Policy Implementation and General Counsel shall develop, amend, and modify written instructions to the field staff that clearly reflect this policy with the understanding that criteria necessary to establish the "good faith" standard shall be approved only by the EEOC.

4. The Office of General Counsel, when engaged in enforcement activity and in exercising the EEOC's discretionary enforcement authority, shall consider and evaluate voluntary affirmative action endeavors of unions and employers.

48 U.S.L.W. 2660 (April 8, 1980).

begun working for defendant two years earlier at age 19, was passed over on the advice of her immediate superior that she was not ready to assume the added responsibility that being a senior rate clerk entailed. However, a memorandum to C. L. Smith, defendant's chief executive, dated April 8, 1975, from William Bolch, Chairman, General Freight Traffic Committee (GFTC), states that Matthews had been fulfilling the duties of senior rate clerk "for the past nine months" and requests that she therefore be promoted and paid the salary of the lowest paid senior rate clerk of all the groups. There is also a July 29, 1974 memorandum from Bolch to the files stating that when Matthews inquired of him as to why she had not been promoted, she was advised that neither of her immediate superiors felt she had the qualifications, and that Matthews "willingly admitted that she was not as capable as the two" men appointed.

The reasons given for passing over Matthews in favor of the two men is not a satisfactory justification to meet plaintiff's claim of gender-based discrimination. Matthews had superior qualifications by all objective standards—seniority and attendance at Traffic Academy, the latter of which was sometimes cited by defendant as a requisite for success and advancement in the freight department. Her acquiescence in defendant's decision to promote two men her junior in seniority did not constitute a waiver of her claims. No objective criteria have been suggested that establish the superiority of the two men who were promoted.

Matthews is entitled to the difference between her pay as an intermediate rate clerk and the pay of Kupferberg and Campbell, the two men promoted ahead of her, between June 28, 1974 (the date of their appointment as senior rate clerks) and April, 1975, when she was finally appointed senior rate clerk. If Kupferberg and Campbell were accorded a different rate of pay during that period, then Matthews is to be paid at the higher rate. Moreover, her seniority in the position of senior rate clerk is to run from June 28, 1974—the day the two men were appointed—with seniority over the two men if they are still employed by defendants and with pay commensurate with that added seniority. In short, she is to receive backpay covering the differential between intermediate and senior rate clerk, and also pay based on her rightful seniority. She is to take that place on the pay scale ahead of the two men as of June 28, 1974, to which her seniority would have entitled her had she not been discriminated against.

B. Nancy DiGisi started her tour of employment as a stenographer in 1937. Then she worked in the determination advice and rate proposal room for 15 to 17 years as assistant manager, dealing with all aspects of tariffs. During World War II, she was acting manager of the file room with the responsibility of matching correspondence with the proper file. When the male employee she had replaced returned after the war, DiGisi returned to her former position, assistant manager of the determination advice department, where her duties required her to determine whether a matter required rate analysis, and if it did, to turn the matter over to those employees dealing with rates. She applied for the job of manager of the freight department in 1974, when that vacancy was publicized, but the job was given to Robert Tomasulo. She is now secretary to John Fitts, one of defendant's executive officers.

Tomasulo came on board in 1961 as a file clerk in the freight department. After 17 months he became a junior rate clerk; after 6½ months in that position he was promoted to intermediate rate clerk. He remained in that post for 2 years and was then promoted to the position of rate analyst. After a short time he became a senior rate clerk. Seven years later he became a chief rate clerk, and after 2 years in that capacity he was made manager of the freight department, successfully bidding on the bulletined position in 1974.

Defendant argued at the Stage II trial that Tomasulo was appointed on merit alone. Pointing to the incumbent's wide experience in rate making, defendant contended that knowledge of rate making is a

requisite to being a successful manager of the freight department because in that capacity one must answer many questions requiring such expertise. Defendant, however, filed Exhibit A during the Stage II proceedings which describes in summary fashion defendant's various activities. The document is apparently designed to give the general public a better understanding of what defendant is and how it operates. In that publication the function of manager of the freight department is spelled out somewhat differently than it was in the testimony presented at Stage II. There Tomasulo is referred to as an office manager "who maintains overall supervision of the Control Section and the department's personnel." Ex. A at page 3. The control section is said to consist "of a group of clerks and typists whose duties entail certain record keeping outside the responsibility of a specific rate group." Id. at pp. 5 and 6. William Bolch is listed as GFTC chairman with Charles Darrell as assistant chairman, and the various research groups report to Bolch.

Moreover, court exhibit 1, a memorandum dated May 17, 1977, in which William Bolch provides a job description for the position, states that the manager supervises all clerical personnel within the freight, printing and mailing departments, monitoring their attendance, punctuality and office conduct; presides at meetings with the chief rate clerk on freight department rules and procedures; interviews and assists the GFTC chairman in the selection of new employees; presents the chairman with performance evaluations "and all other pertinent information on clerical personnel for promotion, pay increases etc."; prepares monthly reports on the three departments; coordinates freight department activities with other departments of the Traffic Executive Association ("TEA"); and supervises office tariff records and files, office supply inventories, printed supply purchases, and maintenance of publications of the freight department.

Neither Ex. A nor court Ex. 1 places any emphasis on expertise in rate making. These job descriptions do not accord with defendant's current description of the position adapted to the challenge of this litigation.

It has already been found that highly subjective and discriminatory criteria were utilized in making this and other appointments, and that the job description and test devised for selecting the winning candidate for the position of office manager, freight department, were homemade. 458 F.Supp. at 1161. The bulletin setting forth the job qualifications was drafted by Bolch without consulting anyone else. The examination was oral, the candidates were not asked the same questions, and in some cases the answers were not scored. Ibid. In 1974, there were no objective standards for promotion. The lack of standards and total resort to subjective and personal criteria in filling this position underscores the gender-based bias shown in Stage I. See Barnett v. W. T. Grant Co., 518 F.2d 543, 549–50 (4th Cir. 1975); Rowe v. General Motor's Corp., 457 F.2d 348, 358–59 (5th Cir. 1972).

Women were not given a fair opportunity or evaluation. We know that men lacking all the requisite requirements or qualifications have been favored with promotions and given the opportunity to learn their new positions on the job. Moreover, the office manager's job does not appear to differ from that of any other office manager—to see that personnel are on hand and available to keep the work of a department or organization moving smoothly.

DiGisi was an employee much senior to Tomasulo in terms of service. She had great familiarity with the rate making process, tariffs, and the records and files of the organization. There is no question but that DiGisi was denied the appointment in 1974 and promotion prior thereto because she was a woman. She was certainly qualified for the position of manager, freight department, and in the area of record keeping (which was one of the major functions of the position) her experience far surpassed that of the man chosen for the job. Defendant cannot frustrate plaintiff by upgrading the job requirements beyond those called for when the position was filled.

Defendant has failed to meet its burden of proving that non-discriminatory criteria were the basis for the failure to appoint DiGisi. She is entitled to backpay, equalling the difference between the salary she has received since the date of Tomasulo's appointment in 1974, to the present and the salary she would have received had she been appointed manager of the freight department. Moreover, she is entitled to receive that differential in pay until such time as she retires, is appointed to a position at the same level of pay as manager of the freight department, or is offered a similar position with equal pay which she is qualified to fill and declines the appointment.

■ C. Ashley Mackey has been with the defendant for 13 years. She was hired in 1967, as a file clerk in the general freight traffic committee section. She transferred to data processing as a key punch operator in 1969, became a console operator, and advanced to senior operator by 1972, when she became manager of systems scheduling. Her responsibilities included seeing that work that came into the department was done properly and working with data to design and/or modify programs to defendant's specifications. She resigned in 1973, after a year as manager of systems scheduling but returned in the spring of 1974. She then worked part time in the tariff bureau coding tariffs for computerization and became a console operator, which is her current position.

In data processing there are three units: key punch, programming and operations. Mackey works in operations. Each of the other units has a male supervisor: George Dugal in key punch and Ray Scardelli in programming. There is no supervisor of operations, although Mackey functions in that capacity. William Wallace is director of the overall computer systems and planning operations and Robert Simpson, as overall head of data processing, supervises the operations unit as well.

Mackey is senior console operator and has trained 6 persons to handle that equipment. She is required to check data and make

certain it is in correct form to run, and in general supervises the operational section of data processing. No reason was advanced as to why a supervisor was needed in key punch and programming but not in operations, the section in which that position would necessarily be assigned to a woman. Nor was it made clear why Simpson should have been given the responsibility for direct supervision of operations in addition to his overall supervision of data processing. There is no non-discriminatory reason why Mackey, who occupies the senior position in operations, has not been named supervisor of that section and given a salary commensurate therewith when she is performing that responsibility in fact. Mackey is entitled to be named supervisor of operations and be accorded a salary at the same level as the salary paid to Dugal and Scardelli; the salary and title should date from the time she was given her current responsibilities.

■ D. Catherine Brzezinski started as a file clerk in 1971, then became secretary for the director of public services, programmer, senior programmer, and systems programmer. Ray Scardelli was appointed over her as supervisor of systems programming in September, 1976. He had slightly more experience than she in the field, and he was senior to her in defendant's employment by several months. However, Brzezinski scored extremely high on the programmer aptitude test, while Scardelli's score was mediocre. Brzezinski completed her training course in computer science with a highly satisfactory score while Scardelli was rated satisfactory. Scardelli came to the defendant as a tariff compiler in August, 1972, and became a junior programmer in August, 1973. Brzezinski started working as a programmer in November, 1973. Thus, in terms of experience in computer technology in defendant's employ, Scardelli was senior to Brzezinski by some three months. Their career rise is instructive. Scardelli became junior programmer August 1, 1973, intermediate programmer November 1, 1973, and senior programmer on August 2, 1974. Brzezinski became jun-

ior programmer on November 16, 1973, intermediate programmer on August 2, 1974, and senior programmer on October 11, 1974. It took Scardelli roughly 10 months to move from intermediate to senior programmer, but Brzezinski only 2 months.

During Stage I of this proceeding the court determined that when the bulletin was published for systems programmer, only Brzezinski and Scardelli could meet the indicated requirements for the position. No tests were given and Scardelli was chosen. The reasons defendant gave at Stage I for the selection of Scardelli are totally at variance with those given at Stage II. At Stage I it was said that Scardelli was chosen because of his outside education. At Stage II, while the testimony was somewhat confusing, defendant's apparent position was that Scardelli was hired because he had greater experience in programming and greater familiarity with defendant's new operational procedures and machinery. Brzezinski testified that Scardelli and she worked together on the new system. I credit her testimony.

There was no fair appraisal of Brzezinski's qualifications for the position of systems programmer, simply because she was female. She should have been given fair consideration for the position, and if she had been, she would have been selected over Scardelli. Accordingly, Brzezinski is entitled to backpay, equalling the difference between her pay and Scardelli's as systems programmer from September, 1976, to the present. Moreover, she is entitled to receive this differential until such time as she is promoted to a job level commensurate with or higher than the indicated position. Since she is an extremely gifted woman, Brzezinski must be considered for any upgraded position requiring knowledge and skill in the use and functioning of computerized equipment.

■ E. Eileen Costanza has been with Eastern Weighing and Inspection Bureau ("EWIB") for ten years, employed as a file clerk and stenographer in the New York office. In February, 1976, a vacancy occurred in the position of inspector in the New York office. No notification that the vacancy existed was given to defendant's employees. Costanza at the time had had 6 years experience at EWIB, was thoroughly familiar with the clerical work, had audited outside inspectors' expense accounts and was generally familiar with the various aspects of an inspector's position. A man from outside, Louis Santoro, was hired, although Costanza was more conversant with what the job entailed. Later in the same year, 1976, an inside inspector retired, and Costanza applied for this position. It was offered to a man. Rex Clark, Director of EWIB, admitted that she was qualified, and the court found in Phase I that Clark had advised one of the secretaries that Costanza's sex disqualified her for the job. In December, 1976, the position of inside inspector was abolished, and one half of the work of that position was assigned to Costanza at a raise of $15.00 per week.

Costanza was denied promotion to a position for which she was clearly qualified. She is entitled to the difference between her salary and that of inside inspector from the date she applied for the position to the time the job was abolished, and she is entitled to the difference between her salary and the salary of inspector, EWIB from December, 1976, when the position of inside inspector was abolished, until she is hired as an inspector in New York or is offered the position and declines.

■ F. Pamela Trumble was employed at the Detroit office, EWIB, in 1972, as a transit clerk. She is a high school graduate, had completed courses in transportation before being hired by EWIB, and had been an office manager supervising 5 employees of an air cargo organization. She had three years experience in the handling of loss and damage claims and salvage as well as experience in the field while working for a shipping company. In 1975 an inspector's position became available in Detroit, and she applied for it. Her application was not acted on locally, which is the usual practice, but was mailed to New York. A man, Tony Taylor, was appointed to the job in August, 1975. Trumble was clearly qualified and

indeed, on the evidence before me, I am confident she would have been offered the job but for her sex. Taylor, who received the appointment, had held clerical positions with other railroads, but did not have familiarity with inspector's audits, opening and posting weight agreements, and handling various inspector forms involved in inspector's work, which were a part of Trumble's job routine. There is no non-discriminatory justification for hiring Taylor over Trumble. Accordingly Trumble is entitled to backpay, that is the difference between her salary and Taylor's from August, 1975, to the present and into the future until her salary equals that which Taylor receives as an inspector or until she is hired as an inspector or is offered the position and turns it down.

■ G. Irene Sehring was first employed by defendant in 1943. She left in 1961, but returned in 1967, to work in EWIB. Thereafter, she became a secretary in accounts in 1975, and was responsible for keeping a record of the various health, hospitalization and insurance benefit programs in which employees were enrolled. She contends that she should have been made manager of employee fringe benefits in May, 1976, when the job, without being bulletined, was assigned to James McGirr. It is not clear to me that Sehring possesses management capabilities. She certainly knew all the employee benefit programs carried by defendant, but the job would seem to require more than that. On the basis of this record, it is not clear that the choice of McGirr over Sehring was based on the latter's sex. Without adherence to a gender-based policy of discrimination, it is likely that management would have chosen McGirr over Sehring. Accordingly, Sehring's claim for backpay is denied.

■ H. Theresa Ste. Marie has worked for the defendant since 1953, and her experience has been in the accounting department. As indicated in the Stage I opinion, Ste. Marie is an individual with considerable ability. While she is clearly not familiar with the newer, more modern accounting procedures and practices which defendant

has recently instituted in the department since Victor Ottomanelli was hired in 1978, she had thoroughly mastered the procedures utilized by defendant prior to that time.

While I do not believe the failure to hire Ste. Marie to Ottomanelli's position violated Title VII since defendant obviously cannot be barred from upgrading its procedures or its work force, Ste. Marie was qualified for a number of positions which were denied to her because of her sex. She applied for the job of manager, freight department, in 1974, but refused to take the examination unless she was able to have a neutral observer monitor her responses. She has functioned in effect as assistant comptroller since at least 1970. She has helped train new employees, including persons such as John O'Connell and James McGirr who were hired to positions which she was qualified to fill. Thomas McCarrett, who held the position of assistant comptroller in 1970, was absent 3 to 6 months a year and Ste. Marie handled his job. This is not the normal, customary, incidental performance of the functions of one's superior, referred to earlier. This was a regularized assignment of Ste. Marie to take over her superior's duties and responsibilities without benefit of the privileges and emoluments commensurate with the position. In 1976, the job of manager, employee fringe benefits, was given to James McGirr. Ste. Marie was thoroughly familiar with these programs and was clearly qualified in training and experience to manage their operation and development. She was not even considered for this job or that of assistant comptroller, solely because of her sex. Ste. Marie is, as indicated previously in Stage I, a take charge individual. She was a source of information for the entire accounting department because she knew defendant's programs and procedures far better than any other employee. If she had been a man she would surely have been appointed to a supervisory position in the department. She is entitled to backpay constituting the difference between her salary and McGirr's from May, 1976, to such time as she is offered a position at that salary or until her retirement.

Defendant seeks to denigrate Ste. Marie on the grounds of personality and erratic attendance. It seems that for a while she worked only 4 days a week, apparently making up the difference by coming to work earlier than the usual time on the days she worked. Whatever that situation, defendant gains nothing, since Ste. Marie's shortened schedule was authorized and acquiesced in by her superiors. Nor will the personality issue prevail. Defendant used Ste. Marie's skills and ideas for many years to its advantage. It cannot now turn her strengths—her aggressiveness and take charge personality—into weaknesses to suit its Stage II purposes.

I. The claims of Ruth Fitzgerald, Gloria Downey, and Mary Berdel that their failure to be promoted was based on their sex have not been established. Fitzgerald has worked at EWIB since 1951. She applied for the position of manager, freight department, in 1974, when she was supervisor, file department. While she is clearly qualified to handle files, it is not clear that she could handle a more complex administrative role as manager, freight department. It does not appear to the court's satisfaction that she possesses requisite supervisory capabilities warranting a holding that she was denied promotion because of her sex.

Gloria Downey has been secretary of the Detroit office of EWIB. She has handled much of the paper work of the Detroit office, and when the present district manager was appointed, Downey had to familiarize him with office procedures. The district manager vacancy was not posted, but Downey must have known that the vacancy existed and did not apply for the position. While it is clear that she is extremely knowledgeable in terms of secretarial functions in the Detroit office, it is not clear that she possesses administrative and executive skills which a district manager of the Detroit office should possess.

 Mary Berdel is a long time employee of defendant. She started as a file clerk. When she went on a leave of absence in 1960, she was still a file clerk. She returned in 1975, as a file clerk and took the position of clerk typist in the accounting department in October, 1975. She is now accounts receivable billing clerk. Under Ottomanelli, reorganization is taking place, and new employees are being hired at the salary Berdel presently receives. No Title VII violation is demonstrated. Inflation has meant that old salary levels are no longer competitive. That is a current reality, and there is no basis for any claim of gender-based discrimination merely because new employees are being hired at the salary Berdel now receives.

## IV

*The Claim For Affirmative Relief*

 Although defendant has taken steps to eliminate some aspects of its long standing policy of gender-based discrimination, job opportunities in the higher reaches of the organization have not been opened to women, and no action has been taken to establish uniform guidelines for promotion, to recruit female employees, to provide periodic job evaluation procedures, or to identify more highly qualified female employees, much less to move them to top positions in the organization. Defendant has offered no plan during Stage II proceedings that affords any assurance that the discrimination found to exist will not continue and be repeated. Indeed, rather than presenting a plan for remediation of its illegal practices, defendant, throughout Stage II, has taken the position that it has not been guilty of any discrimination practices whatsoever. Plaintiffs are entitled to have specific remediation of the violations, *E.E.O.C. v. Local 638*, 565 F.2d 31, 34 (2d Cir. 1977), and injunctive relief to eliminate the past discrimination and insure that these illegal practices will not be repeated. *Fullilove v. Kreps*, 584 F.2d 600, 606–07 (2d Cir. 1978), aff'd sub nom. *Fullilove v. Klutznick*, —— U.S. ——, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 354–55 (5th Cir. 1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

Plaintiff introduced testimony of a personnel administration specialist, Dr. Ann F. Decker, who testified that comprehensive, standardized personnel policies applicable throughout the organization were not only essential to remedy gender-based discrimination, but were requisite to the operation of rational personnel practices and procedures. As has been indicated in Stage I, there are no operative objective standards for selection or promotion. There are no standardized tests. Selection is wholly subjective and made ·wholly by men, without, in some cases, advising the employees that a vacancy exists or publicizing the qualifications for the position. Under these circumstances a program of affirmative action is mandated. *See James v. Stockham Valves & Fittings Co., supra,* 559 F.2d at 355. Selection procedures, promotion policies and objective standards for advancement should be formulated and instituted into a system-wide structure. Defendant has resisted doing this and indeed seems to have adopted a posture of intransigence. The defendant is ordered to undertake a comprehensive job evaluation and classification of all positions throughout the organization, with standardized descriptions of each job and its duties, the qualifications for each position, including minimum qualifying education and experience and the relation of each position to the line of progression it occupies within the organization. A standardized ̍performance appraisal system should be instituted with an annual or semi-annual performance review in which each employee is rated in writing on previous performance and given the opportunity to respond to a negative appraisal. The performance ratings and review procedures should be publicized and fully explained so that each employee understands the procedure. All vacancies should be posted throughout defendant's organization, along with qualifications required to fill the position.

Selection procedures for promotion must be standardized, and when applicants are tested the tests must conform to E.E.O.C. guidelines of job relatedness. The procedures for selection and promotion should be based on written directives and criteria so that the basis for a successful candidate's choice may be readily ascertainable by reference to objective yardsticks. Uniform standards for upgrading pay based on merit or any other criteria should also be made applicable on an organization-wide basis. Internal mechanisms should be established to identify women with high performance capabilities so that they can be considered for future vacancies in more responsible positions. Moreover, procedures should be put into effect that will enable women hired prior to 1975, to transfer to new positions without loss of pay in order to gain experience and training to enable them to move to higher positions. Openings in EWIB should be publicized through various public agencies, and a special effort should be made to recruit women for all vacancies.

Defendant should be given the first opportunity to devise a comprehensive set of procedures, outlined above, that are to be made operative in the organization under court order. Defendant will be given 4 weeks from the date of the filing of this opinion to present to the court with notice to plaintiff its proposed order embodying these procedures. Plaintiff will be accorded three weeks from the date of service of defendant's proposed order to present its counter order to the court with notice to defendant. The proposal should provide for continued jurisdiction of the court for a period to oversee full implementation of whatever proposals for affirmative action are ordered.

*Claim for Attorneys' Fees and Costs*

Plaintiff's counsel has applied for a fee of $294,800 based on 2,948 total hours spent on this litigation (2,193.5 hours in Stage I and 754.5 hours in Stage II); a fee of $2,750 for Herbert Titlebaum, who participated in the fee application hearing; $593 for the costs involved in the preparation and distribution of the notice to the class; a $1,855 fee for Dr. Ann F. Decker, plaintiff's expert on personnel practices and procedures; $5,295 for the fee of Leona Beane, an attorney and statistician who aided in the preparation of the statistical data and acted as consultant to counsel while the statistics were present-

ed. (It is claimed that 529½ hours were spent on these matters by Beane and $5,295, or $100 an hour, is requested.) $4,080 is requested as fee for the statistician, Dr. Levine; $1,673 for the Stage I trial transcripts; $1,557 for the Stage I depositions; $3,434.29 for the statistics clerks; $869.40 for materials and posting; $510 for key punch coding; $921.91 for general copy costs; $6.72 for the marshal; $33.80 for class notification; $57 for subpoenas; and $501.09 for travel, hotel and cab for Trumble and Downey for a total in addition to attorney's fees of $21,451.68 according to plaintiff and $21,387.21 according to my figures.

 Award of counsel fees is clearly in order in this case, see 42 U.S.C. 2000e–5(k), since a prevailing plaintiff in a Title VII case is ordinarily entitled to recover attorneys' fees "in all but special circumstances." *New York Gaslight Club, Inc. v. Carey,* —— U.S. ——, 100 S.Ct. 2024, 2027–29, 64 L.Ed.2d 723 (1980); *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 416–17, 98 S.Ct. 694, 697–98, 54 L.Ed.2d 648 (1978). To deny an award in this case would represent an abuse of discretion. *Cf. Mid-Hudson Legal Services, Inc. v. G & U, Inc.,* 578 F.2d 34, 37–38 (2d Cir. 1978).

The standard for determining what is an appropriate award is set forth in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470–74 (2d Cir. 1974). Under the standards of that case, the court must ascertain the number of hours and the value of the time spent by counsel. These provide the starting point for evaluation. In this type of case the risk of litigation must be assessed as well. *See id.* at 471–72; *Women's Committee for Equal Employment Opportunity v. National Broadcasting Company,* 76 F.R.D. 173, 182 (S.D.N.Y.1977) (MacMahon, J.). A hearing has been held on plaintiff's application.

 Plaintiff's counsel is a 1965 graduate of New York University. She takes the position that $100 per hour is appropriate for a lawyer of her background and skills. She is presently concentrating on cases of sex discrimination, but is an inexperienced litigator and during the course of the two phases of the case evidenced considerable inexperience, confusion and insecurity. She was faced in a hotly contested trial by highly qualified and experienced counsel, and indeed the latter's consummate professionalism may have highlighted the litigation weaknesses of plaintiff's counsel. She spent a great deal more time than necessary in the trial in both Stages I and II. In indicating counsel's lack of experience as a litigator, the court does not mean to denigrate or criticize Ms. Caplan but merely to state what it believes to be fact, and her lack of litigation skills has to be taken into account in assessing both the time spent and the hourly rates which counsel should be paid. To paraphrase Judge Weinfeld's statement in *Boe v. Colello,* 447 F.Supp. 607, 610 (S.D.N.Y.1978), the expenditure of more time than is reasonably necessary to present a client's claims fairly and properly suggests either inexperience, or if counsel is experienced, dilletantism. In neither case should the losing side be taxed as counsel learns his trade or is guilty of indulgences. *Ibid.* While plaintiff's counsel does not score high as a litigator, her skill in brief writing and legal analysis, despite some rather bizarre touches, is on a decidedly superior level. Counsel has been out of law school for some 15 years, and at the present rate of inflation perhaps an hourly rate of $100 may not be too far out of line. I do not believe that her fee should be based on this rate, however, for time devoted to pretrial and trial matters, except for the time devoted to the preparation of memoranda or briefs requiring legal analysis. Accordingly, I am awarding a counsel fee based on an hourly rate of $80 for all time spent in this litigation except the time spent on the preparation of briefs, for which she is to be paid at the rate of $100 per hour.

There are no time records prior to 1977. In her affidavit counsel states that time records are not available for this period. She estimates that 15 hours were spent in consultation, preparation and drafting of the complaint, 12 hours in preparation of plaintiff and examination before trial, 50

hours on the class action motion, and 25 hours in preparation of interrogatories. I cannot accept these figures and must rely on the court's own experience to determine the time reasonably required to draft the complaint, prepare the class action motion and the interrogatories. *See Boe v. Colello, supra*, 447 F.Supp. at 610. *Blank v. Talley Industries, Inc.*, 390 F.Supp. 1, 4 (S.D.N.Y. 1975) (Weinfeld, J.). The 15 hour figure in consultation, drafting and preparation seems proper; no more than 6 hours should have been required to prepare the plaintiff and for examination before trial; 25 hours should have sufficed for the class action motion, and 10 hours for the preparation of interrogatories. The 25 hours on the class action motion is placed in the $100 per hour category. Accordingly, for time prior to 1977, plaintiff is to be paid at $80 per hour for 31 hours and at $100 per hour for 25 hours (class action motion).

For the period January 27, 1977, to March 1, 1978, plaintiff lists roughly 2,091.5 hours spent. She designates these lists as time records, but it is clear that the listing, like the figures prior to 1977, is merely a reconstruction rather than an accurate time record. There are no real informative details. For example, for January 27, 1977, counsel lists "arrangement to mail notice, checking final notice" and indicates 4 hours spent. January 31 lists 8 hours "review of the file to plan statistics" and February 1 has the same designation and the same number of hours spent. This is repeated throughout the affidavit which purports to depict counsel's time records. From this hodgepodge of so-called time records, I have concluded that it is reasonable to grant some 918 hours in pretrial and trial matters which should be recompensed at the rate of $80 per hour, and some 239.5 hours for preparation of memoranda and briefs which should be recompensed at the rate of $100 per hour. For the latter, I have accorded 16.5 hours for brief and argument on the discovery motion, and the remainder of the allocation for research on post trial brief in Stage I, reading the transcript since counsel was ordered to gear the argument to the evidence, proposed findings and conclusions and reply brief.

Counsel indicates that she spent 754.5 hours in Stage II proceedings. Some 63 hours are listed in research and preparation of findings, conclusions and brief in Stage II. I regard that as reasonable; and in preparation and hearing in Stage II an allocation of 400 additional hours is reasonable. Accordingly, counsel is granted 1,349 hours at the rate of $80 per hour which include 31 hours prior to 1977, 918 hours on Stage I and 400 hours on Stage II, for a total of $107,920. There are 25 hours prior to 1977, 239.5 hours in Stage I and 63 hours in Stage II devoted to brief writing and legal analysis for a total of 327.5 hours for which plaintiff counsel should be paid at the rate of $100 per hour, for a total of $32,750. Plaintiff's counsel fee based on time and hourly rate is therefore $140,670.

The case was difficult and complex and defendant resisted fiercely. Therefore, the risks were high, and although I rate counsel low on the scale in litigation skills, she is entitled to a bonus as a private attorney general and for the risks of litigation. *See City of Detroit v. Grinnell, Corp., supra*, 495 F.2d at 471–72; *Population Services International v. Carey*, 476 F.Supp. 4, 11–12 (S.D. N.Y.1979) (Pierce, J.). Accordingly, I am awarding counsel a bonus of 10%, or $14,067. Thus adding the $14,067 bonus to the $140,670 basic total fee, the total is $154,737.

Included in the calculation was time spent on fee application. *See Gagne v. Maher*, 594 F.2d 336, 343–44 (2d Cir. 1979), *aff'd*, —— U.S. ——, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Lund v. Affleck*, 587 F.2d 75, 77 (1st Cir. 1978); *Prandini v. National Tea Co.*, 585 F.2d 47, 52–54 (3d Cir. 1978).

Counsel seeks fees for her expert witness. Dr. Decker is a personnel expert and her testimony was essential to plaintiff's claims for affirmative action relief; the work of Beane and Levine and the latter's testimony concerning statistics were also essential, as was the work of the statistics clerks in helping to prepare the statisti-

**814**

cal data. Decker's fee is reasonable, but I cannot see why Beane should be paid more than Levine, who was, in fact, the expert. Accordingly, $1,855 is authorized for Decker, $4,080 each for Levine and for Beane and $3,434.29 for statistics clerks, $869.40 for materials posting, and $510 for key punch coding for a total of $14,828.69 in connection with the preparation of statistical data which was critical to the Stage I proceeding and is recoverable. *See Pennsylvania v. O'Neill,* 431 F.Supp. 700, 713 (E.D.Pa.1977), *aff'd,* 573 F.2d 1301 (3d Cir. 1978). In addition, plaintiff is awarded as costs $1,673 for Stage I trial transcripts, $1,557 for Stage I depositions, $921.91 for general copy costs, $593 and $33.80 for costs in connection with class notification, $57 for subpoenas, and $6.72 for the marshal for a total of $4,842.43. These are all allowable costs and are granted, and should not come out of the pocket of the plaintiff. However, it does not appear to me that travel expenses for Downey and Trumble ought to be costs assessed against defendant, nor do I see where Titlebaum added anything to the proceedings to warrant the award of a fee, and requests for these amounts are denied.

SETTLE ORDER.