**Gerald Lamar TATE, Plaintiff,**

v.

**DRAVO CORPORATION, Defendant.**

**No. C–C–82–0778–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Dec. 12, 1985.

John W. Gresham, Ferguson, Watt, Wallas & Adkins, Charlotte, N.C., for plaintiff.

John Wester, Charlotte, N.C., for defendant.

## MEMORANDUM AND ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on a Complaint filed by the Plaintiff, Gerald Lamar Tate, against the Defendant, Dravo Corporation ("Dravo"), in which the Plaintiff alleges that he was discharged from his employment with the Defendant because of his race and in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission in September of 1979.

The trial was heard before the undersigned on September 23 and 24, 1985 in Charlotte, North Carolina. The Plaintiff was represented by John W. Gresham and

Geraldine Sumter, Attorneys at Law. The Defendant was represented by John R. Wester and Dan T. Coenen, Attorneys at Law. After a full trial of the matter, the Court, having carefully considered the testimony and exhibits, enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) This action was brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

(2) The Plaintiff, Gerald Lamar Tate, is a black citizen of the United States who resides in Gaston County, North Carolina.

(3) The Defendant, Dravo Corporation, is a corporation doing business in Mecklenburg County, North Carolina. It has two facilities in the Charlotte area: Plant 5 in Pineville and Plant 6 in Charlotte.

(4) The Defendant is engaged in the fabrication of heavy pressurized pipe, including pipe used in utility plants and pipe used to contain high pressure steam. The American Society of Mechanical Engineers ("ASME") requires that all welders employed by fabricators of pressurized pipe qualify for each welding process to be used in production welding before engaging in production work. Section IX of the American Society of Mechanical Engineers Boiler and Pressure Vessel Code ("ASME Code") prescribes the objective criteria the employer must use in testing the welder.

(5) In December 1977, the Defendant hired the Plaintiff to work as a journeyman, or MIG-flux core, welder at Plant 5. As the Plaintiff was not experienced in MIG-flux core welding, the Defendant trained him in this procedure. In accordance with the ASME Code, the Defendant would not allow the Plaintiff to do any production work until he passed a weld test. The Plaintiff was given two weeks to train and prepare for his test. He successfully passed a "roll weld" test at the end of his first two weeks with the Defendant, and further upgraded his qualifications by passing a "top quarter weld" test one month later.

(6) After having qualified to do production work, the Plaintiff began doing MIG-flux core production work on the second shift at Plant 5. He continued in that job until March 30, 1979, when he and three white welders at Plant 5 were laid off as part of a general reduction of the Defendant's workforce. While those welders were laid off, several other white welders who had either the same length of service as or less service than the Plaintiff were retained.

(7) Shortly after his layoff, the Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming that his layoff was racially motivated. Through negotiations initiated by the EEOC, the parties agreed in November 1979 to settle the charge. The settlement agreement provided that the Plaintiff would drop his charge on the condition that the Defendant would recall the Plaintiff to the position of journeyman welder before recalling or hiring any other welder.

(8) The Defendant recalled the Plaintiff to the first shift at Plant 5 on December 10, 1979 to do MIG-flux core welding. The Plaintiff's supervisors upon his return were Steve Hathcock, the first shift welding foreman, and Gerald Neely, welding supervisor for Plant 5. Also at Dravo at that time were Phillip Temple, the plant engineer responsible for weld testing, and Brian Connor, the Defendant's general manager in charge of all Charlotte operations.

(9) Because the Plaintiff had not used the MIG-flux core welding process for approximately eight months, he was required to pass a weld test before resuming production work. The ASME Code provides that a previously qualified welder who does not do production work for three months (or in some instances six months) must renew his qualification before performing the process covered by his previous qualification. Def.Ex. Temple 6, QW–322.

(10) Phillip Temple, who as previously noted was responsible for the testing of

welders, determined that the Plaintiff should renew his qualification by taking the top quarter weld test, which he had passed during his initial employment with the Defendant. Temple credibly testified that he had a policy of testing recalled welders at the highest level at which they had been certified during their prior employment with the Defendant. As Temple noted, and as Gerald Neely also testified, if the Plaintiff passed the top quarter test, he would be recertified as to both top quarter and roll welding. Thus, he would not have to take more than one test once he was back at work.

(11) The Plaintiff testified at his deposition that he was given the proper and correct test upon his return to work in December 1979. Tate Dep. 116. At trial, however, the Plaintiff contended that the Defendant discriminated against him by requiring him to take the more difficult top quarter weld test rather than the roll weld test. Gerald Neely credibly testified that the Defendant had not treated the Plaintiff differently from any other welder by giving him the top quarter test, and that he knew that some white welders had had to take the top quarter weld test when recalled. Steve Hathcock did testify that three white welders who were recalled in 1982 and Marvin Brown, a black welder recalled in 1983, were given the roll weld test rather than the top quarter test. As Neely explained, however, in or about 1982 the Defendant changed its testing policy to require all applicants to take a roll weld test that had to be completed in eight hours and pass both a bend test and an X-ray test. The Plaintiff took his top quarter test in 1979, when there was no requirement that the test be a roll weld test, be completed in eight hours, or pass an X-ray test.

(12) The Plaintiff testified at trial that when he reported to Steve Hathcock on December 10, 1979, he was taken to the welding area and was given "proper equipment." He spent his first day back at work setting up his welding machine and practicing for his requalification test. At the time the Plaintiff was recalled, the De-fendant's policy was not to require a welder to begin his qualification test at any particular time. The welder was given time to practice, and he would himself indicate when he was ready to take his test. The Plaintiff told Hathcock he was ready to begin his test after approximately five hours of practice. Hathcock credibly testified that the Plaintiff made no objection to the machine to which he had been assigned and on which he had practiced, to the type of test he was to take, or to the amount of time he had had to practice.

(13) The Plaintiff took his weld test on Tuesday, December 10, 1979. Phillip Temple evaluated the Plaintiff's test strips and concluded that one of the test strips did not meet ASME Code requirements. The bending of that strip revealed an open defect in excess of $\frac{1}{8}$ inch and evidence of "trapped slag" in violation of QW–163 of the ASME Code. The Plaintiff's best memory at trial was that he had been shown the strip that had failed, and he agreed at his deposition and at trial that the strip contained trapped slag.

(14) After determining that the Plaintiff's weld test had failed, Temple called Brian Connor, the Defendant's general manager in charge of Charlotte operations, and discussed the test results with him. Had the Defendant followed its normal policy and indeed the standard practice in the industry, the Plaintiff would have been terminated immediately as a result of failing his requalification test. An experienced journeyman welder ordinarily is given only one chance to pass an entry-level weld test. In the Plaintiff's case, however, Temple and Connor decided to break with standard practice and give him another chance to pass the test. The Court credits their testimony that they wanted to do everything possible to get the Plaintiff back into productive welding work and thereby avoid a lawsuit. Neely, Temple, and Hathcock testified that the Plaintiff is the only experienced journeyman welder they knew who was ever given more than one chance to pass an entry-level weld test. No one told the Plaintiff at the time that it was unusual

for him to be given more than one test, but the Plaintiff testified at trial that he remembered that certain persons who failed the entry-level test during his initial employment were immediately terminated.

(15) Despite being given a second chance, the Plaintiff again failed to requalify as a journeyman welder. Temple determined that the inside wall of one of the test strips the Plaintiff cut out of his weld coupon was ½ inch too thin to meet ASME Code standards for bending. The Plaintiff does not dispute that he cut the strips too narrow or that he failed his second weld test.

(16) Temple reviewed the results of the second test with Connor. Since the failure was due to a cutting problem, they decided that it would be fair to give the Plaintiff another chance.

(17) On Thursday, December 13, 1979, the Plaintiff took his third test. Temple evaluated the Plaintiff's test strips and concluded that one of the strips did not meet the ASME Code's requirement for minimal wall thickness as a result of excessive grinding. Temple again conferred with Connors about the results of the test. Since this was the second test being rejected because of dimensional problems, they decided to send the test strips to Law Engineering Testing Company, an independent consulting firm, for a second, independent analysis to remove any questions about the test results. The documented report of Law Engineering and the trial testimony of Larry Coble, a Metals Laboratory Supervisor for Law Engineering, show that he and two other persons at Law Engineering confirmed Temple's conclusion that the Plaintiff had ground the test strip too thin to meet ASME Code requirements.

(18) After the Plaintiff's test results were received from Law Engineering, Connors and Temple decided to give the Plaintiff a fourth test in the hope that they would be able to retain him. Before the Plaintiff took his fourth test, Temple, Neely, Hathcock, and Burke, an engineer, met with him. They showed him his previous tests and explained to him why they had been rejected. Temple asked the Plaintiff if he understood the test requirements, and he responded that he did. The Plaintiff did not object to any aspect of the testing at that time.

(19) During his fourth test the Plaintiff had trouble putting in his root pass; he testified at trial that he had "blown through" the root pass. He asked Hathcock if he could start his fourth test again for this reason. Hathcock told him he would help him in any way that he could, but that he could not allow him to start his fourth test over again. As the Plaintiff himself had predicted, the fourth weld test he had performed was so patently flawed that it did not pass even a visual inspection.

(20) By Tuesday, December 18, 1979, when he had completed his fourth test, the Plaintiff had earned journeyman welder's wages for seven full days without doing any productive welding work. Neely credibly testified that the Plaintiff's four failures raised serious questions about his ability to do quality welding work, and that it appeared unlikely at that point that the Plaintiff would qualify if given further tests. As a result of his repeated test failures, Connor decided to terminate the Plaintiff. Neely informed him of his termination on December 19, 1979.

(21) The Plaintiff sought to show through the expert testimony of Joseph Spencer, Jr. that he in fact was qualified despite the Defendant's determinations that he had failed the four tests according to the ASME Code. Spencer testified that he would have passed the Plaintiff on his first and third tests. With regard to the first test, Spencer testified that the tear on the corner of the test strip that Temple had rejected was not due to slag inclusion or to an internal defect and that the strip had shown good weld fusion when bent. He concluded, therefore, that all four test strips in the first test were acceptable under the ASME Code. Spencer testified that he also would have qualified the Plaintiff to do production welding work on the basis of the third test, mainly because all of the test strips exhibited good weld fusion upon

being bent by Law Engineering. With regard to the required thickness of the test strips, Spencer noted that the general industry practice was to tolerate a 20% deviation, but he also noted that each company has its own standard and can establish its own tolerance within that deviation.

(22) The Court does not find Spencer's testimony more persuasive than Temple's testimony with regard to the acceptability of the first and third tests for several reasons. First, Spencer's observation that the crack in the rejected test strip from the first test did not result from slag inclusion is contrary not only to Temple's observation, but to the Plaintiff's admitted observation of "trapped slag" at the time the test was given. Second, the fact that the third test strips bent successfully is irrelevant. Both Temple and three testers at Law Engineering concluded that one of the strips did not meet the ASME Code's threshold wall thickness requirement, a prerequisite that must be met before even reaching the bend test. Law Engineering bent the strips without being directed by the Defendant to do so, and, by its own admission, "for information only." Finally, Spencer is a metallurgical engineer, not a welding engineer. Unlike Temple, he is not a Certified Welding Inspector and has not had extensive experience in weld inspection or weld testing. He was not certified at trial as an expert in weld engineering, weld testing, or the application of Section IX of the ASME Code. Accordingly, his opinion as to the acceptability of the Plaintiff's tests is entitled to little weight as compared to that of Temple, who administered between 300–400 weld tests while at Dravo.

(23) The Plaintiff also tried to establish the insignificance of the difference between the thickness of the rejected strip in the third test and the minimum thickness required by the ASME Code and thereby show that he really was qualified as a result of his third test. It was established at trial that the rejected test strip most likely would have measured 0.290 inches before it was bent by Law Engineering. The ASME Code requires that the wall be 0.375 inches thick before a strip will qualify

for the bend test. Temple and Spencer testified that the industry as a whole will accept a 20% deviation from that measurement, which would reduce the thickness called for by the ASME Code to 0.300 inches. If the 20% deviation were applied to the Plaintiff's rejected test strip, that strip would be only 0.01 inches too thin to meet the ASME thickness requirement.

(24) As the Plaintiff's expert witness testified, however, each company has its own standards and can establish its own tolerance within the deviation generally tolerated in the industry. It is evident from Temple's testimony that the Defendant strictly applied the ASME Code. The Plaintiff knew that the welding standards at Plant 5 at the time of his recall had to be particularly high; he admitted in the notes he made shortly after his discharge that "Mr. Burk [sic] ... spoke up [at the meeting held before the Plaintiff's fourth test] to say that some X-ray work was coming in the shop and the test was very critical. Very important that it be first rate." Def.Ex. Tate 2 p. 3.

(25) The Court finds that it was not improper for the Defendant to judge the Plaintiff's weld tests in accordance with the ASME Code as written. It therefore declines to second-guess the Defendant's conclusion, confirmed by an independent examiner, that the Plaintiff's third test did not qualify him to do production welding work.

(26) Likewise, the fact that Hathcock may have commented to the Plaintiff upon the completion of his third test that his test strips would "probably go" does not persuade the Court that it should disregard the Defendant's findings concerning the third test. Hathcock is not an engineer and was not responsible for evaluating the weld test. The Plaintiff himself admitted in the notes he made shortly after his discharge that he thought that "one of the coupons [in the third test] was a little small" before Hathcock made that comment. Def.Ex. Tate 2 p. 2.

(27) Because he was never given specifications as to the required width or thickness nor any measuring device with which he could measure his strips before submitting them, the Plaintiff claims that the reason for failing him on his third test was improper. The Court does not agree, however, since there is no evidence that the Defendant treated the Plaintiff any differently in this respect than it treated any other welders being tested. In addition, the Plaintiff made no objection to the testing procedure and stated that he understood the testing requirements at his meeting with Temple et al. before his fourth test.

(28) The Plaintiff suggests that the Defendant discriminated against him with regard to his testing in several respects. First, he suggests that Dravo discriminated against him, or intentionally tried to get rid of him through testing, by assigning him to a defective welding machine upon his return in December 1979. The Plaintiff testified at trial, however, that he was given "proper equipment" when he arrived at Plant 5 on December 10, 1979, and that he had used the same type of machine during his initial employment with the Defendant. Hathcock credibly testified that the reason he took the Plaintiff to that particular work station was that "it was empty." The Plaintiff himself acknowledged that he did not reject the machine after having practiced on it a full day, and the evidence indicates that the Plaintiff did not complain about his machine until he was taking his fourth test. Def.Ex. Tate 2; Testimony of Steve Hathcock; Def.Ex. Hathcock 1a–b. Although Hathcock acknowledged that such a complaint was registered, his own personal observation during the Plaintiff's testing was that the machine was running properly. Def.Ex. Hathcock 1a–b. Temple also credibly testified that he was familiar with the welding machines at Plant 5 during that time and was not aware of any problem with the machine to which the Plaintiff was assigned.

(29) The Plaintiff further complains that Hathcock should have permitted him to practice instead of assigning him to "chase materials" while he was awaiting his test results. The Plaintiff conceded at his deposition that this is his only objection with regard to the Defendant not giving him enough time to practice or get training. Tate Dep. 105. The Plaintiff testified at trial that he had not been required to chase materials during his first term of employment, and at his deposition testified that none of the other persons he had observed take the welding test during his initial employment had ever been assigned to chase materials. The Plaintiff himself gave a simple explanation for this at his deposition: neither he nor the other persons taking the weld test during his initial employment had to wait for their results, because the testing machine was at Plant 5 during that time and the people being tested could immediately take their strips to the machine for evaluation. During the Plaintiff's second term of employment, the testing machine was located at Plant 6. His test strips, therefore, had to be sent out of Plant 5 for evaluation, leaving a time lag between the actual testing and determination of the test results.

Further, Steve Hathcock and Gerald Neely credibly testified that it is standard practice at Dravo to assign testing welders some sort of productive work while awaiting test results. Hathcock's statement that no one gets the opportunity to practice while waiting for his test results is not surprising. It would make no sense to permit unproductive practicing for another welding test while awaiting the results of the last test, since a positive result would remove the need for a later test altogether. Indeed, the standard policy was *not* to allow the experienced welder to take more than one entry weld test; allowing a newly hired or rehired welder to practice while awaiting test results would be inconsistent with the "one test only" rule.

(30) Despite the fact that the Defendant gave him four opportunities to pass his requalification test, the Plaintiff contends that the Defendant discriminated against him by giving white employees repeated opportunities to take weld tests or to prac-

tice for tests while denying him the same opportunities. The evidence does not support the Plaintiff's contentions. Two white employees, Charles Pope and John Gouveia, were allowed to reapply and retake the test upon rehire. The Defendant's employment records show that Pope was rehired on August 31, 1983 and terminated on September 1, 1983 for failing his weld test; rehired on March 26, 1984 and terminated on March 27, 1984 for failing the welder qualification test; and finally rehired in August 1984. Those records show that John Gouveia was rehired on October 12, 1983 and terminated on October 14, 1983 for failing the welder qualification test; and rehired and terminated in March 1984 for failing his weld test.

Although it is clear that these white welders were allowed to reapply and retake the weld test, it appears that they were not given more than one chance to requalify each time they were rehired. The Plaintiff was treated more favorably than these white welders, since he was given four chances over a two-week period to try to pass his welder qualification test. Further, the testimony of Richard Moose, the business manager for the local union, shows that the Plaintiff could have had the same opportunity as Gouveia and Pope to be rehired by the Defendant and try once again to requalify as a welder. Moose notified the Plaintiff on September 16, 1983 that a welding position at Plant 6 was available for him. Moose testified that the Defendant never told him that it did not want the Plaintiff to fill the position. On September 19, 1983, however, the Plaintiff refused the job because of his past experience at Dravo. As the Defendant was willing to rehire the Plaintiff, his claim that Pope and Gouveia were treated more favorably is without merit.

Marvin Brown's testimony that two other white welders, Cathy Burnette and Clarence Keener, were allowed to work on welding tests for a period of time without passing them likewise does not support the Plaintiff's contention that he was treated less favorably in his testing than whites. Even if Brown's testimony were wholly accurate and believable, these two white welders were not in situations similar to that of the Plaintiff. Burnette was a qualified welder already doing production work, who was seeking in late 1981 to upgrade her welding certification. Keener was an apprentice, being paid substantially less than an entry-level welder, who was participating in the union apprenticeship program for the very purpose of learning how to weld so as to become a journeyman welder. In these cases, the employees were seeking to *upgrade* their skills, whereas an experienced welder who is hired or rehired, like the Plaintiff, is seeking only to qualify for work in which he is already skilled. Therefore, Brown's testimony is unsuccessful in detracting from the credibility of the Defendant's witnesses, who uniformly testified that the established practice was to give experienced hires or rehires like the Plaintiff one, and only one, test.

(31) The Plaintiff also contends that the Defendant discharged him in retaliation for the EEOC charge of discrimination the Plaintiff had filed against it. He relies in part on a comment made by William Andre, the Defendant's Industrial Relations Manager, during a meeting with the Plaintiff after he had completed his fourth test. Andre expressed his concern over the trouble the Plaintiff was having with the weld test, and told the Plaintiff he was not raising the subject because he had filed an EEOC charge, but because the testing had to end at some point. The Court does not find the fact that this statement was made "out of the blue" to be persuasive on the issue of retaliation.

(32) The Plaintiff also claims that he was called back to work before the Defendant really needed any welders just so the Defendant could fail him on his test and get rid of him in retaliation for his EEOC charge. The Defendant's employment records indicate that no other welders were hired or transferred to Plant 5 after the Plaintiff was discharged in December 1979 and that no hires were made until well into 1980. The Court notes that the Defendant's employment records also do not re-

flect all the transfers between Plants 5 and 6 allegedly experienced by some of the Plaintiff's witnesses. Brian Connor testified that the Plants frequently experienced fluctuations in business and in the need for more welders, and that some welders from Plant 6 may have transferred at least temporarily to Plant 5 after the Plaintiff was discharged. Given the discrepancies in the employment records noted above, it is not clearly established that there were no welders from Plant 6 who occasionally filled the Defendant's fluctuating needs at Plant 5 without a formal record being made thereof. In any event, the fact that the Defendant could have fired the Plaintiff after he failed his first test instead of giving him three more chances to pass leaves little room for an inference from the Defendant's apparent failure to replace the Plaintiff that its decision to discharge him was retaliatory.

(33) The Plaintiff presented the testimony of seven other blacks who have worked for the Defendant in an attempt to show that the Defendant engaged in a pattern or practice of race discrimination and retaliation. The witnesses the Plaintiff called were Marvin Brown, Walter Ingram, Fred Welch, Eugene Marsh, Rosa Dargins, Christine Archie, and Sam Sims. The Court will not recount the testimony of these witnesses in detail, as it finds their allegations of race discrimination and retaliation largely incredible and/or irrelevant. None of these other employees was similarly situated to the Plaintiff, who was a welder terminated after failing four weld tests at Plant 5 in December 1979. Only two of these witnesses spent more than one week at Plant 5; Sam Sims worked as a welder at Plant 5 from December 1979 until some point in 1979 before the Plaintiff was recalled, and Marvin Brown worked as a welder at Plant 5 from July 1983 until July 1984. Brown and Sims also held positions at Plant 6 at other times during their employment with the Defendant. Other than Brown and Sims, none of the Plaintiff's witnesses worked for the Defendant as a welder.

(34) All of the Plaintiff's witnesses except Sims filed charges of discrimination against the Defendant with the Equal Employment Opportunity Commission. Those claims that were actually subject to individual review and determination (*i.e.*, the claims of Ingram, Marsh, and Brown) resulted in EEOC findings that there was no probable cause to believe that race discrimination had occurred. Since none of those witnesses works for the Defendant now, the Plaintiff apparently called them in part to prove that the Defendant had retaliated against them for filing their EEOC charges. The evidence of retaliation offered by these witnesses, however, is weak, if not nonexistent. For example, after Christine Archie filed her EEOC charge, the Defendant promoted her twice and offered her another promotion and the opportunity to become a welder through the apprenticeship program; the Defendant gave her an unconditional offer of reemployment six months after she was laid off as part of a reduction in force. Rosa Dargins stayed with the Defendant for more than six years after filing her EEOC charge and then decided, on her own, to leave the Defendant for health reasons. Fred Welch was retained by the Defendant for approximately three years after filing his EEOC charge, and though he was demoted twice, he received two promotions before being laid off in January 1981 due to a reduction in force. Marvin Brown filed an EEOC charge after he was laid off as part of an apparently large reduction in force. A year later, the Defendant rehired him and retained him for a full year before he was laid off because of another reduction in force. Walter Ingram and Eugene Marsh filed charges alleging race discrimination after they were terminated; there is no evidence that either of them ever reapplied for work with the Defendant or was subjected to any adverse action by the Defendant after filing an EEOC charge. As the Court noted above, the Plaintiff himself was referred back to the Defendant by the Union without objection by the Defendant, but the Plaintiff decided on his own not to accept the available position.

(35) The evidence that these witnesses have produced concerning racial slurs or episodes has not in any way been "connected up" with the Plaintiff's termination, the testing process leading up to that termination, or the supervisors involved in that termination. Much of this evidence is simply not probative of anything, such as Sims' testimony that workers at Dravo self-selected different eating areas at a company Christmas party, with one group being all white. Brown's and Sims' testimony concerning the alleged substitution of good X-rays from successful welders in place of bad X-rays done by unsuccessful welders is irrelevant, even if true, since the alleged practice involved both black and white welders. Brown's confusing testimony about one white welder's alleged aid to a white pipefitter taking a test in 1983 or 1984 is not probative of race discrimination or retaliation, particularly with respect to the Plaintiff's discharge four or five years earlier. Racial slurs or the countenancing of racial slurs were attributed only to George Boulware and other supervisors and employees at Plant 6. Despite the Plaintiff's claim that Boulware was superintendent of both Plant 5 and 6, the Court credits the consistent testimony of the Defendant's witnesses that at all times since 1973 Boulware worked as a supervisor only at Plant 6 and had no supervisory responsibility over Plant 5. In any event, Boulware had no role in the Plaintiff's termination.

(36) The Plaintiff's witnesses produced no evidence attributing any racially objectionable conduct to any supervisor involved in the Plaintiff's termination. Although Sims testified about a discussion with Neely about a picture of "educated monkeys" on the company bulletin board, the contents of that picture as described have no obvious racial connotation. At the time of the discussion, Neely merely expressed his honest disagreement with Sims' opinion that the picture had a racial connotation. There is no evidence tying racial remarks or episodes to Hathcock, who oversaw the weld tests, to Temple, who judged the weld tests, or to Connor, who ultimately decided to terminate the Plaintiff. Indeed, Sims testified that Connors had responded to a complaint that a black crane operator had been disciplined for falling asleep on the job while a white crane operator had not by promptly disciplining that white employee.

(37) The absence of racial discrimination against the Plaintiff is supported by his own deposition testimony. At his deposition, the Plaintiff acknowledged that he did not believe that the unfair treatment that he alleged to have occurred was the result of racial discrimination against him, but rather retaliation for his filing an EEOC charge. Tate Dep. 88–89. The Plaintiff withdrew from this contention at trial, presumably because of the allegations of discrimination he had gathered from his trial witnesses. Although the Plaintiff recanted his deposition statement at trial, the Court is of the opinion that his sworn admission at his deposition three years after his termination nonetheless has probative value. Unlike the other witnesses the Plaintiff called, he was directly involved in the events surrounding his termination and had been at Plant 5 previously from December 1977 to March 1979. Therefore, he had had an opportunity to judge for himself whether any racial animosity existed at that plant. He had also had an opportunity to talk with Brown and Sims, the only witnesses who had also worked at Plant 5 for any extended length of time, and with his attorney, before he testified at his deposition. Nonetheless, he admitted at his deposition that he did not believe his discharge was racially motivated. The Court will not disregard this admission, since it is unlikely that the Plaintiff would have made it at that point in time if he had genuinely believed that Hathcock, Neely, Temple, or Connor had intentionally discriminated against him because of his race.

(38) Having carefully considered all the evidence, the Court finds that the Defendant did not engage in a pattern or practice of race discrimination at Plant 5 or specifically retaliate or discriminate against the Plaintiff in his testing or discharge because of his race or the fact that he had filed an EEOC charge. If it had been the Defend-

ant's intention to get rid of the Plaintiff in retaliation for the EEOC charge or because of his race, it is more likely than not that it would have fired the Plaintiff after his first failure rather than giving him repeated opportunities to avoid being terminated. Assuming the Plaintiff raised an inference of discrimination or retaliation, the Defendant credibly testified that the Plaintiff was discharged because he failed to requalify to do production welding work in accordance with the ASME Code. The Plaintiff failed to prove that the reason given by the Defendant for his discharge was pretextual or that he was a victim of disparate treatment in the testing procedures because of his race or his previously filed EEOC charge.

(39) Finally, there is a factual dispute concerning the date on which the Plaintiff received his right-to-sue letter from the EEOC, which set forth the EEOC's determination that there is not reasonable cause to believe the Plaintiff's allegation against the Defendant is true. The Defendant contends that the Plaintiff received the right-to-sue letter on September 18, 1982. If he received the letter on September 18, 1982, he would have had until Friday, December 17, 1982, which is the ninetieth day after September 18, to file his Title VII claim against the Defendant. The Complaint in this case was not filed until December 20, 1982.

(40) The Plaintiff testified at his deposition that he received the letter on September 18 or 20, since the envelope in which it was sent was postmarked September 17. Tate Dep. 123, 125. In response to the Plaintiff's subsequent request for admissions, the Plaintiff denied that he received the letter on September 18, and stated that he received it on September 20 to the best of his recollection. He explained that he recalled that he was not at home on the date the Post Office first tried to deliver the letter to him. Def.Ex. Tate 7–8. At trial, the Plaintiff testified that he did not remember when he received the letter or the circumstances surrounding its delivery. He did admit at trial, however, that the postmark on the certified mail receipt that had accompanied the letter and was sent

back to the EEOC looked like September 16 or 18, but not 20. When asked how he could have received the letter on September 20 when the certified mail receipt accompanying it was sent back on September 16 or 18, the Plaintiff simply stated that he had no explanation.

(41) The Court finds that the Plaintiff received his right-to-sue letter on September 18, 1982. Although the postmark on the certified mail receipt is somewhat blurry, the first digit in the date is definitely a "1," and, therefore, the Plaintiff could not possibly have received the letter on September 20. The second digit appears to be an "8," and the date "9–18–82" was handwritten in the blank on the receipt marked "date of delivery." Def.Ex. Tate 10.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1343.

(2) The Defendant is subject to the jurisdiction of this Court and is an "employer" as defined by 42 U.S.C. § 2000e(b), being engaged in an industry affecting commerce and employing in excess of fifteen employees.

(3) Title VII, 42 U.S.C. § 2000e–2(a)(1), provides in pertinent part, that:

It shall be an unlawful employment practice for an employer—. . . to discharge any individual . . . because of such individual's race.

Section 2000e–3(a) provides that:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Section 1981 provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and

enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white persons....

(4) The well-known order and allocation of proof and burdens set forth in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981), are applicable to the Plaintiff's discriminatory treatment claims as well as his retaliation claims. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). The Plaintiff must first prove by a preponderance of the evidence a *prima facie* case of discrimination or retaliation. If the Plaintiff proves a *prima facie* case, the employer has the burden to produce a legitimate nondiscriminatory reason for the employment decision in order to rebut the inference of discrimination or retaliation raised by the Plaintiff's *prima facie* claims. Once the employer produces such a reason, the Plaintiff then has the burden to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were but a pretext for discrimination or retaliation. *Burdine, supra,* 450 U.S. at 253; *Ross, supra,* at 365. At all times the Plaintiff retains the ultimate burden of persuading the Court that he has been the victim of intentional discrimination. *Burdine, supra,* 450 U.S. at 253.

■ (5) In § 1981 suits and Title VII cases of disparate treatment, such as the instant action, the Plaintiff must prove intentional discrimination. It must be shown by the Plaintiff that the employer discharged him because of his race. The trier of fact may rely on inferences rather than direct evidence of intentional discrimination, but discriminatory intent must be proved by a preponderance of the evidence, whether direct, circumstantial, or otherwise. *See Texas Department of Community Affairs v. Burdine, supra; Board of Trustees v. Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d

216 (1978); *Crawford v. Western Electric Co.,* 614 F.2d 1300 (11th Cir.1980).

■ (6) To establish a *prima facie* case of discrimination, the Plaintiff must prove actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on discriminatory criterion under the Act."

*Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (*quoting International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)); *see also Texas Department of Community Affairs v. Burdine, supra; McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ (7) The elements of a *prima facie* case of race discrimination are the same under Title VII and § 1981. *Gairola v. Commonwealth of Virginia Department of General Services,* 753 F.2d 1281, 1285 (4th Cir.1985). Absent direct evidence of discriminatory treatment, the Plaintiff may establish a *prima facie* case of discriminatory discharge under the *McDonnell-Douglas* model by showing that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) despite his qualifications he was discharged; and (4) after his discharge the employer continued to seek applicants from persons of the Plaintiff's qualifications. *Id.* at 1286; *Smith v. University of North Carolina,* 632 F.2d 316, 332 (4th Cir.1980).

(8) In the present case, the Plaintiff has attempted to establish a *prima facie* case of race discrimination in three ways: (1) utilization of the *McDonnell-Douglas* proof scheme; (2) reliance on an alleged pattern or practice of discrimination; and (3) reliance on direct evidence from other former Dravo employees of racial slurs and episodes designed to show a racially hostile work environment.

■ (9) Under the *McDonnell-Douglas* proof scheme, the Plaintiff has not estab-

lished a *prima facie* case because he has not shown by a preponderance of the evidence that he was qualified for the position of journeyman welder. The evidence in the Plaintiff's case in chief reveals that the Plaintiff failed four separate welding tests administered and evaluated in accordance with the ASME Code. Without passing the test, the Plaintiff could not be certified to do production welding work.

(10) The Plaintiff's rebuttal evidence from his expert, Joseph Spencer, does not change the Court's conclusion that the Plaintiff failed to establish a *prima facie* case under the *McDonnell-Douglas* proof scheme. As noted in the findings of fact, the Court does not consider Spencer's testimony concerning the acceptability of the Plaintiff's tests more persuasive than that of Temple, particularly since Temple's determination with respect to the most seriously disputed test was confirmed by a certified independent welding analyst.

(11) The Plaintiff also contends that he established a *prima facie* case of disparate treatment by showing that the Defendant has engaged in a pattern and practice of treating black employees differently from white employees.

To meet his burden in demonstrating a pattern or practice, the Plaintiff must prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. [He must] establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice.

*International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 336, 97 S.Ct. at 1854.

(12) The Plaintiff offered the testimony of seven former black employees of the Defendant regarding their individual experiences at Dravo to support his claim that the Defendant engaged in a pattern or practice of treating blacks differently than whites. Even if the Court found the testimony of these witnesses to be credible, their claims are too few, too unrelated, too sporadic, and too isolated to establish a basis from which to infer that intentional racial discrimination was the Defendant's "standard operating procedure" with respect to its testing procedures and termination policies.

(13) Courts that have found a small number of discriminatory acts to be sufficient to support a finding of a pattern or practice of discrimination have done so only in light of other substantial evidence, such as statistical proof or direct evidence that a company has adopted a policy of discrimination. *See, e.g., Holsey v. Armour & Co.,* 743 F.2d 199, 214 (4th Cir.1984) (pattern of intentional discrimination in denying qualified black candidates sales and supervisory positions established by statistical evidence, specific instances of intentional discrimination, and direct evidence of intentional discrimination, *e.g.,* manager's statement to employee that blacks were not hired in sales because customers would not buy from them), *cert. denied,* —— U.S. ——, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985); *EEOC v. Ford Motor Co.,* 645 F.2d 183, 187, 197 (4th Cir.1981) (though employer made only one contested employment decision between 1971 and 1973, its pre-1972 history of never hiring a woman coupled with additional evidence of discrimination was sufficient to support inference of pattern or practice of sex discrimination), *rev'd on other grounds,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); *cf. Lilly v. Harris-Teeter Supermarket,* 720 F.2d 326, 328 (4th Cir.1983) (testimony of nine witnesses who had prevailed on their individual promotion claims established too few instances of direct discrimination to support inference of pattern or practice of discrimination with respect to promotions), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984); *Ste. Marie v. Eastern Railroad Association,* 650 F.2d 395, 405–06 (2nd Cir.1981) ("when ... relevant statistics are lacking and the probative evidence of discrimination is confined ... to seven individual incidents, subjective decision-making methods are not sufficient to establish a pattern or practice of discrimination.... two incidents would be insuffi-

cient to support the inference of a routine or regular practice of discrimination. . . . [i]f there were evidence that a policy of discrimination had been adopted, perhaps two or even one confirmatory act would be enough"). The Plaintiff has produced neither direct evidence that the Defendant had adopted a company policy of race discrimination nor statistical evidence to support his pattern or practice claim.

(14) Perhaps more importantly, the Plaintiff has not shown any causal connection between the experiences of his witnesses and his own discharge. Virtually all of those witnesses worked at Plant 6, were not welders, and complained about allegedly discriminatory treatment in employment contexts other than weld testing and terminations. The supervisors about whom they complained had no supervisory responsibility at Plant 5 and were not those involved in the testing and termination of the Plaintiff (with the exception of Neely, whose statement to Sims concerning the "educated monkeys" picture was found not to be objectionable by the Court). Thus, even if the testimony of the Plaintiff's witnesses did establish some sort of pattern or practice of race discrimination at Plant 6, it is not probative of discriminatory intent in the decision to terminate the Plaintiff. *See Lilly v. Harris-Teeter, supra,* at 338 (evidence of pattern of intentional discrimination in hiring decisions should not be considered in determining whether pattern or practice of intentional discrimination existed in promotions where supervisors responsible for promotions were not shown also to be responsible for hiring).

██ (15) The Plaintiff's third approach to making out a *prima facie* case of race discrimination against him entailed offering evidence of racial slurs and episodes from his seven witnesses to show that the Defendant maintained a racially hostile work environment. The Plaintiff contends that this testimony is "direct evidence" that the Defendant acted with racial animus, which would shift to the Defendant the burden of showing by a preponderance of the evidence that it would have taken the same action absent the discriminatory animus. *See Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Board of Education,* 684 F.2d 769, 775 (11th Cir.1982).

(16) The Court fails to see how testimony concerning alleged racial slurs at Plant 6 can be considered "direct" evidence that the supervisors involved in the Plaintiff's termination intentionally discriminated against him. There is no evidence that the Plaintiff was a victim of or even a witness to racial slurs. Likewise, there is no evidence to support a finding that the Plaintiff worked in a racially hostile environment at Plant 5 or that the supervisors involved in the events affecting him in December 1979 condoned or engaged in "a steady barrage of opprobrious racial comment." *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981) (racial comments that are part of casual conversation, accidental, or sporadic and almost never directed toward plaintiffs do not trigger Title VII's sanctions); *see McCann v. Delaware River Port Authority,* 548 F.Supp. 1206, 1214 (E.D.Penn.1982) (Title VII not violated where "racial slurs by several . . . foremen played no part in the employment actions; those foremen neither had an effective input into the decision nor were consulted for their opinion on the matter"), *aff'd,* 725 F.2d 669 (3rd Cir.1983). In any event, "while a pattern or practice of harassment directed at a single employee can violate Title VII, casual or isolated manifestations of a discriminatory environment, such as a few racial or ethnic slurs, may not raise a cause of action." *Bundy v. Jackson,* 641 F.2d 934, 943 n. 9 (D.C.Cir.1981) (sexual harassment). The Plaintiff's evidence falls within this latter category. The Court concludes that the Plaintiff has failed to establish a *prima facie* case of race discrimination based on his allegation of a racially hostile work environment.

██ (17) To establish a *prima facie* case of retaliation under the *McDonnell-Douglas* proof scheme an employee must

establish three elements by a preponderance of the evidence:

(1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection existed between the protected activity and the adverse action.

*Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985) (citations omitted). The first two elements are present in this case. Based on the above findings of fact, however, the Court concludes that the Plaintiff has not established by a preponderance of the evidence that a causal connection existed between his filing an EEOC charge and his termination. Indeed, the fact that the Plaintiff filed an EEOC charge more likely than not caused the Defendant to treat the Plaintiff *more* favorably by giving him four chances to pass the test in the hope of avoiding a lawsuit.

(18) The Court also concludes that the Plaintiff failed to establish a *prima facie* case of retaliation on the basis of a pattern or practice of retaliation. As discussed in Finding of Fact (34), *supra,* the Plaintiff's evidence of retaliation by the Defendant against other employees was weak, if not nonexistent; it is certainly insufficient to show a pattern or practice of retaliation from which the Court could infer a retaliatory motive in the Plaintiff's case.

(19) Even if the Plaintiff had established a *prima facie* case of race discrimination or retaliation, the Court concludes that the Defendant offered substantial evidence that the Plaintiff's termination was based on legitimate, nondiscriminatory business considerations. The Defendant not only articulated its reason for discharging the Plaintiff, but showed by a preponderance of the evidence that it decided not to retain the Plaintiff because it sincerely believed that he was not qualified to do production welding work. The factfinder need not judge the correctness of the employer's assessment of the employee's abilities; it need only determine that

the employer in good faith believed that the employee's performance was unsatisfactory and that the asserted reason for the decision was not a mere pretext for discrimination. *Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982); *Bostic v. Wall,* 588 F.Supp. 994, 1002 (W.D.N.C.1984), *aff'd,* 762 F.2d 997 (4th Cir.1985). The Court concludes that the Plaintiff failed to show by a preponderance of the evidence that the Defendant's reason for terminating him was a pretext for race discrimination or that his discharge would not have occurred "but for" the fact that he filed an EEOC charge. *See Ross, supra,* at 365–66.

(20) The Court, therefore, concludes that the Plaintiff should not prevail on any of his claims. As noted by the District of Columbia Circuit, "[n]o good reason exists for allowing a nonqualified employee to invoke Title VII [or § 1981] to cure deficiencies in his or her qualifications, or to immunize potentially serious defects in the worker's job profile." *Williams v. Boorstin,* 663 F.2d 109, 116 (D.C.Cir.1980). The Defendant gave the Plaintiff ample opportunity to pass the weld test; it cannot be held accountable for the Plaintiff's own failure to qualify for the job.

(21) Finally, the Court concludes that the Plaintiff's Title VII claims are barred because he failed to file his action in a timely fashion. Private actions based on Title VII must be commenced within ninety days of receipt of a right-to-sue letter. 42 U.S.C. § 2000e–5(e). The Plaintiff filed his suit outside the prescribed ninety-day period. Although the time period may be tolled or waived for equitable considerations, *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), the Court concludes that no equitable considerations exist in this case to justify waiving the ninety-day filing requirement. This conclusion, however, does not affect the Plaintiff's § 1981 claims of race discrimination and retaliation. The Plaintiff would not have been barred from relief had he been

**1106**

successful in establishing his § 1981 claims.

(22) Any finding of fact which is determined also to be a conclusion of law is so deemed, and any conclusion of law which is determined also to be a finding of fact is so deemed.

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS, HEREBY, ORDERED that:

(1) This action is DISMISSED WITH PREJUDICE;

(2) Each party shall pay his and its own costs, including attorney's fees; and

(3) Judgment will be entered in accordance with this Memorandum of Decision.